# IN THE COURT OF APPEALS OF IOWA

No. 22-1467
Filed April 26, 2023

**IN THE INTEREST OF P.B.,**
**Minor Child,**

**B.M., Mother,**
    Petitioner-Appellee,

**J.B., Father,**
    Respondent-Appellant.
_____

    Appeal from the Iowa District Court for Marion County, Erica Crisp, District

Associate Judge.


    A father appeals the termination of his parental rights under Iowa Code

chapter 600A (2021).  **AFFIRMED.**


    Ryan A. Genest of Simpson, Jensen, Abels, Fischer & Bouslog, P.C., Des

Moines, for appellant.

    Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellee.

    Lois Vroom, Knoxville, attorney and guardian ad litem for minor child.


    Heard by Bower, C.J., and Vaitheswaran and Tabor, JJ.

**PER CURIAM.**

A father, J.B., appeals the termination of his parental rights under Iowa Code section 600A.8(3)(b) (2021).  He contends that he did not abandon his daughter, P.B.  And he asserts that termination was not in her best interests.  On our review, we find P.B.'s mother, B.M., offered clear and convincing evidence of abandonment.  We also conclude that termination serves P.B.'s best interests.  Thus, we affirm the termination order.

### I.  Facts and Prior Proceedings

The parents married in June 2010.  They welcomed their daughter, P.B., in February 2015.  Before his daughter's birth, J.B. completed an eleven-month tour in Afghanistan with the United States Army National Guard.[1]  When he returned from service, J.B. suffered from post-traumatic stress disorder (PTSD), a traumatic brain injury, sleep apnea, and nerve damage to his back and hands.[2]  His mental-health issues contributed to strife in their marriage; J.B. admitted that they "were fighting a lot at the time, a lot of arguing, and I was just not being a good husband. I was sleeping on the couch, hanging out with friends more than I should of, drinking a little bit more than I should of."

By October 2015, J.B. left a note for B.M. saying that he planned to move out: "I specifically said I think I need to either get an apartment on my own or . . .

---

[1] He also completed a two-year tour in Iraq before the marriage.

[2] Some of his mental-health issues may stem from the causalities of his fellow soldiers in Afghanistan: "I lost two out of my squad July 16, 2012, and I lost four out of first platoon January 6, 2012."

move in with my parents, and we need to work on us, that I'm having all these issues." He left the next day for Des Moines, but left most his belongings behind.[3] B.M. immediately called J.B.'s parents. They asked J.B. what the note meant. He responded, "I don't know what it means."

B.M. filed for divorce that November. After J.B. was served with the divorce petition, he "had a breakdown" and attempted suicide. He realized he "needed to get help" and went to the Veterans Affairs (VA) Hospital in Des Moines. The father entered a 90-day PTSD program. He was not allowed to leave until the program was completed. And he stayed for 100 days. He testified that he was discharged with a disability rating of 100 percent for his PTSD and 70 percent for his brain injury. He had minimal contact with P.B. during this time. But, at his request, B.M. did bring the child for two visits while he was in the hospital.

J.B. failed to respond to the divorce petition. So the district court entered a default decree in February 2016. The court ordered J.B. to pay $114 in monthly child support, based on the federal minimum wage. The district court awarded sole legal custody and physical care of P.B. to B.M., who lived in Peoria, Iowa. The decree allowed J.B. visitation, "at the times, days, and in a manner as may be agreed upon by the parties from time to time, and not to interfere with the activities, well-being and best interest of the child." Plus, J.B.'s visits had to be supervised by B.M. or another adult that she designated. J.B. testified he did not blame the Court "by any means" for acquiescing in B.M.'s request to be in charge of visitation.

---

[3] The mother testified that he did not tell her where he was going. But he disputes that account.

Following the divorce, J.B. moved out of Iowa. He testified that the parents of a fallen comrade loaned him money to relocate to Indiana so he could "get work and obviously finish working on myself." After the move, he worked full-time as a corrections officer. Meanwhile, B.M. stayed with P.B. in Peoria. They continued to have some contact with P.B.'s paternal grandparents, who also lived in Iowa. However, J.B. did not have any personal contact with the child for nearly five years.

According to trial testimony, J.B. had four visits with his daughter after he moved. Their first interaction was at the Eddyville Raceway. The second visit was at the Blank Park Zoo in 2017. He also saw P.B. at Christmas time that year. And B.M. recalled that J.B. "showed up randomly" on her porch when he was back in Iowa once to visit his parents. On top of those in-person visits, J.B. testified that he and his daughter spoke on the phone two or three times per week while he was living in Indiana.

But things changed when both parents remarried in 2018.[4] B.M.—along with P.B.—moved to a home in Pella with her new husband, J.M.[5] That year, according to J.B.'s testimony, "all contact stopped, and I would just get voicemails." He remembered calling B.M. from his office phone; she picked up, then hung up, realizing it was him. And J.B.'s mother, D.B., also testified that she saw B.M. send a call from J.B. to voicemail.

B.M. testified that she decided in 2018 that contact between J.B. and their daughter was no longer in the child's best interests. Yet B.M. claimed that she

---

[4] By the time of trial, J.B. and his new wife had a five-month-old son.
[5] Pella was about twenty miles away from B.M.'s former home in Peoria. B.M. had a son with her new spouse and became a stepmother to his three daughters from a previous marriage. Their family moved to a different address in Pella in 2019.

never told J.B. that she was ending communication.[6] But J.B. testified that he got the message through his parents. They showed him text messages and emails from B.M. informing them that they too would be cut off from their grandchild if they allowed him to contact P.B.

After learning of B.M.'s decision, J.B. said he considered hiring a lawyer, but couldn't afford one: "I did call several, tried to reach out to several Veteran Services to see if a lawyer could be appointed or help someone with—you know, on disability and, unfortunately, that just wasn't the case." J.B.'s mother corroborated his inability to afford legal representation: "He didn't have the money to do that."[7] Despite his limited means, J.B. did maintain regular employment. Moving from Indiana, he took a job in North Carolina with a specialty lighting company. Eighteen months later, he relocated to Virginia, where he trained young people how to ride motocross.

P.B.'s relationship with her paternal grandparents also changed after B.M. remarried. The couple, who lived in Sully, had been seeing P.B. two to three times per week. Then after 2018, B.M. restricted their visits. For example, P.B. could not stay overnight at her grandparents' house because B.M. worried they would allow J.B. to see her. Still, they would take P.B. camping one weekend per month. But B.M. ended those interactions too in October 2019.

---

[6] B.M. admitted that if J.B. had asked to see P.B., she would have said no.

[7] When asked why she did not assist in lining up an attorney, the grandmother testified that J.B. was still working through his PTSD and she "also didn't have the money at that point" to help.

That same year, J.B. tried to pay child support but did not follow through.[8] In January, February, March, and April, he sent checks in the amount of $150.00. But when B.M. waited to deposit all four checks at once that April, they were returned for insufficient funds. B.M. testified that J.B. left an angry voicemail after the checks bounced: "He specifically said that he didn't want to ever have anything to do with [P.B.] again." J.B. disputed saying that. B.M. also testified that she had "a stack" of checks "at home now that I haven't bothered to take to the bank."

B.M. petitioned to terminate J.B.'s parental rights to P.B. in November 2021. The district court set a hearing and appointed a guardian ad litem (GAL) to represent P.B.'s interests. The GAL filed a report reflecting her conversations with B.M. and P.B. The GAL said she "attempted to contact [J.B.] through his attorney to conduct an interview but that never occurred." J.B. acknowledged he and his attorney were never able to quite manage to set up a time to talk with her, and J.B. further acknowledged it was not the GAL's fault.

After B.M. filed her petition, J.B. met his unpaid child support obligation with help from his mother. The grandmother testified that she was subtracting the payment from J.B.'s inheritance: "unfortunately, [J.B.] doesn't balance a checkbook . . . so that's why I took over and said, I will send the checks."

Two days before hearing, J.B. moved for a continuance. He claimed to be "in the process of relocating" to Knoxville, Iowa.[9] He asked for six months to "possibly reestablish a relationship with his child." But the court denied the motion.

---

[8] B.M. testified that J.B. stopped paying support after sending one initial check at the "very, very beginning" of their divorce.

[9] J.B. testified that he and his wife bought a home with help from her aunt and uncle with a move-in date of next August 2022.

Both parents and the paternal grandmother testified at trial. The GAL filed a report recommending termination.[10] The district court terminated J.B.'s parental rights on abandonment grounds. The court also found that termination was in the child's best interests. J.B. now appeals.

## II. Scope and Standard of Review

We review private terminations under chapter 600A de novo. *In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010). We give weight to the district court's factual findings—particularly on credibility issues—but are not bound by them. *Id.* Our primary concern is P.B.'s best interests. *See id.*

## III. Analysis

Terminations under chapter 600A follow a two-step process. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). First, the petitioner must prove a ground for termination. *Id.* Second, the petitioner must show termination is in the child's best interests. *Id.* The petitioner must offer clear and convincing evidence for both steps. *Id.* The clear-and-convincing standard "is the highest evidentiary burden" for civil cases. *In re M.S.*, 889 N.W.2d 675, 679 (Iowa Ct. App. 2016). For a party to meet this burden, "there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *Id.* (citing *In re L.G.*, 532 N.W.2d 478, 481 (Iowa Ct. App. 1995)).

---

[10] The GAL report also referenced a conversation with B.M. where she stated she had "concerns about [J.B.'s] mental instability and angry outbursts, and his history of dishonesty and substance abuse."

### A. Abandonment

The district court found that B.M. offered clear and convincing evidence that J.B. abandoned P.B. *See* Iowa Code § 600A.8(3)(b). Parents abandon their children under this framework when they "reject[] the duties imposed by the parent-child relationship." *Id.* § 600A.2(20). That rejection is proven if—while being able to do so—a parent makes "only a marginal effort to provide for the support of the child or to communicate with the child." *Id.*

Thus, proof of abandonment takes two forms. Iowa Code § 600A.8(3)(b). First, a parent abandons a child by not contributing toward the financial support of the child in "a reasonable amount, according to the parent's means." *Id.* Or second, by either not visiting the child, not regularly communicating with the child, or not openly living with the child. *Id.* In other words, "[f]or a parent to avoid being deemed to have abandoned the child, the parent must meet *both* the cash and contact components of the statute." *In re G.D.*, No. 20-0984, 2021 WL 2126174, at *3 (Iowa Ct. App. May 26, 2021). When reviewing the evidence, we recognize that a parent's subjective intent "unsupported by evidence of acts . . . manifesting such intent" does not prevent a finding of abandonment. Iowa Code § 600A.8(3)(c).

We first consider J.B.'s economic contributions—the threshold element of abandonment. See *id.* § 600A.8(3)(b); *see also In re W.W.*, 826 N.W.2d 706, 710 (Iowa Ct. App. 2012). This element requires J.B. to contribute a reasonable amount toward his daughter's support in accordance with his means. *See* Iowa Code § 600A.8(3)(b). A "reasonable amount" under section 600A.8(3)(b) differs from court-ordered support under section 600A.8(4). *W.W.*, 826 N.W.2d at 710.

While J.B. wrote support checks in 2019, he had insufficient funds in his bank account to cover them. He did not catch up with his support obligation until December 2021—nearly five years after the divorce. Nor has he sent P.B. any gifts. In his defense, J.B. contends that he "needed time to seek treatment and become stable" after the default decree instituted child support obligations. And he insists that B.M. "would frustrate" his attempts to pay by waiting months to cash his checks. He also points out that he was current on his obligations by the time of the termination hearing.

In her response, B.M. notes that J.B. maintained full-time employment since being discharged from the VA hospital, but still failed to pay child support. And she highlights the fact that even the eleventh-hour payments came not from J.B.'s account, but from his mother's funds.

The district court emphasized that fact in the termination order:

Taking money out of his inheritance that he would not have had access to does not show any type of sacrifice for his child, as he is not out anything. All of his current income goes to support himself, his current wife, and his infant son. He has made no effort to support [P.B.] while this proceeding has been pending while paying lip service to wanting to reestablish a relationship with her and contesting this petition. The court cannot escape the conclusion that if the petition had not been filed, the child support obligation would have remained outstanding in its entirety.

We disagree that a parent must necessarily be "out" something to adequately "provide for the support of the child." *See* Iowa Code § 600A.2(20); *In re K.P.*, No. 14–2068, 2015 WL 4644800, at *2 (Iowa Ct. App. Aug. 5, 2015) (reversing termination because petitioner did not offer clear proof that other parent had financial resources to provide support). The economic support requirements

for section 600A.8(3) are "according to the parent's means." Iowa Code § 600A.8(3)(b).

But we are persuaded by B.M.'s argument that J.B. had the means to contribute financially to P.B. because he maintained stable employment after leaving Iowa. Indeed, J.B. testified to working full time in Indiana, North Carolina, and Virginia. True, the record does not show how much he earned in those positions. Still, we know that he remarried and was raising a child with his new spouse, which shows he had the wherewithal to pay some amount toward P.B.'s support. And he did make the effort, or at least the gesture, of sending monthly checks, each for $150, in January through April 2019. But when B.M. tried to cash them all at once, J.B.'s account contained insufficient funds.

After B.M. petitioned for termination, the paternal grandmother started making support payments. The grandmother explained, "He had made some attempts and, unfortunately, [J.B.] doesn't balance a checkbook and so he thought he had money in there and all of the checks were deposited at one time." It is not hard to believe that a family living paycheck to paycheck might be unable to handle such a large withdrawal. But difficulty in balancing a checkbook is not the same as lacking the financial means to support a child. We recognize that J.B. was working to overcome the debilitating effects of his PTSD during this time. But his ability to find jobs in three different states and start a new family supports B.M.'s position that he abandoned their daughter by failing to make more than a marginal effort at providing financial support.

Because J.B. abandoned his daughter under the financial-support prong, we need not decide whether B.M. prevented him from regular visitation or

communication with the child. *See* Iowa Code § 600A.8(3)(b)(1). "Substantial and continuous or repeated contact with the child is shown by: (1) financially contributing to the support of the child in a reasonable amount according to the parent's means ('cash'), and (2) maintaining sufficient contact with the child as defined in section 600A.8(3)(b)(1)–(3) ('contact')." *G.D.*, 2021 WL 2126174, at *3 (noting that "the parent must meet *both* the cash and contact components of the statute" to avoid a finding of abandonment).

## B. Best Interests

Ensuring a child's best interests requires a parent to "affirmatively assume the duties encompassed by the role." Iowa Code § 600A.1. In determining whether parents meet this standard, we consider whether they have fulfilled financial obligations and demonstrated a "continued interest in the child." That interest is reflected in "genuine efforts" to maintain communication and to develop and keep "a place of importance in the child's life." *Id.*

We also borrow from Iowa Code chapter 232 to flesh out the best-interests test. *B.H.A.*, 938 N.W.2d at 232. On that score, we prioritize the child's safety and the best placement to further her long-term nurturing and growth. *See* Iowa Code § 232.116(2). We know that "the caselaw has limited utility" in the best-interests analysis, with cases coming down to their own facts. *In re Q.G.*, 911 N.W.2d 761, 771 (Iowa 2018). Here, we have factors for and against termination.

On one hand, J.B. has not seen his daughter in four years. The child told her GAL that she "currently does not know what he looks like." And while—"in his heart"—J.B. hoped she would recognize him, he testified he does not really know. The GAL also reported that P.B. wanted her stepfather, who wishes to adopt her,

to be her "only dad." *See In re G.A.*, 826 N.W.2d 125, 131 (Iowa Ct. App. 2012). Granted, this lack of contact is somewhat attributable to B.M.'s actions. But J.B. saw P.B. "less than ten times" before B.M. decided to cut off contact. And he failed to reach out to the GAL during the termination proceedings. This same lack of effort can be seen in the fulfillment of his child support obligations. True, J.B. was current on his support obligations by the hearing. But it is not reassuring that he only took the obligation seriously when B.M. petitioned to terminate his rights. J.B.'s past performance "may be indicative of the quality of the future that [he] is capable of providing." *B.H.A.*, 938 N.W.2d at 233 (citation omitted).

On the other hand, J.B. regularly communicated with P.B. by phone before B.M. cut off contact. *See Q.G.*, 911 N.W.2d at 771 (noting that father and child "communicated by phone for a substantial period until [mother] appeared to present obstacles to such contact"). And though he did not find help, he did seek legal assistance to resume contact with his daughter. He also has a strong support system in P.B.'s grandparents. *See Dale v. Pearson*, 555 N.W.2d 243, 246 (Iowa Ct. App. 1996) (noting family support helps decide a child's best interest).

Still, B.M. asserts that, given J.B.'s absence from P.B.'s life, reintroducing him to the child could be "highly confusing and perhaps traumatic." When asked by the GAL whether it was harmful for a child to have no contact with one of her parents for four years, J.B. responded, "I agree it is harmful, yes, ma'am." The district court agreed, citing a recent case from our court about the potential harm from *not* terminating a parent's rights but instead "reopening the door to the father." *See In re J.S.*, No. 22-0028, 2022 WL 2824778, at *4 (Iowa Ct. App. July 20, 2022). The GAL also agreed: "This little girl is a little bit confused about her name and

about her dads." At the same time, the GAL acknowledged that J.B.'s mental health had improved and that determining P.B.'s best interests was "a harder question" than abandonment. But the GAL emphasized that the father's recent efforts to renew contact with P.B. were "too late." We agree with the GAL's assessment. We cannot deprive P.B. of permanency by hoping that J.B. will someday be able to meet P.B.'s needs. *See B.H.A.*, 938 N.W.2d at 232. Chapter 600A's best-interest factors weigh in favor of terminating J.B.'s parental rights.

**AFFIRMED.**

All judges concur, except Tabor, J., who dissents.

**TABOR, Judge** (dissenting).

The mother's counsel asserted at oral argument that this termination case has "nothing" to do with the father's military service. I strongly disagree. The record shows a direct connection between the wounds he suffered on his tours of duty and his inability to carry on his parenting duties. Now that his mental health has improved, we should not write off his "potential positive contributions" to his daughter's life. *See In re Q.G.*, 911 N.W.2d 761, 774 (Iowa 2018). So I respectfully dissent on the best-interests finding. In my view, B.M. did not offer clear and convincing evidence that P.B.'s best interests would be advanced by terminating J.B.'s parental rights.

The father was deployed to Iraq from 2007 to 2009 and then re-deployed to Afghanistan for eleven months after his marriage. In Afghanistan, he served as a staff sergeant supervising other soldiers in his convoy. Their job was to clear the road of improvised explosive devices (IEDs). He lost six members of his squad in 2012. Now the father has a VA disability rating of seventy percent for post-traumatic brain injury from exposure to several IED device blasts and a disability rating of one-hundred percent for his post-traumatic stress disorder (PTSD).[11]

Those conditions prompted his separation from his family and his lengthy hospitalization. His mother described him as "very distant with the family" after his return from Afghanistan: "I knew he had survivor's guilt." His mother, who had a nursing background, also believed that when J.B. moved away from Iowa he was "still trying to work through his PTSD and get to a good place where he felt like he

---

[11] B.M. agreed that J.B. suffered from PTSD.

could be a good father to [P.B.]." But before J.B. could get a handle on his service-related injuries, B.M. cut off all of his contact with J.B.

J.B. agreed he was "a mess" at the time of the divorce: "It's very hard to put into words unless you've served, and been there, but I came home broken 100 percent, and I still have bad days." But J.B. testified that he was doing better by the time of the termination hearing.

The GAL acknowledged his improvement, but emphasized that "four years is just too long not to have contact with your child." I question how much we can rely on the GAL's opinion in this case for two reasons. First, it was the mother who thwarted J.B.'s efforts to maintain a place of importance in the child's life.[12] *See* Iowa Code § 600A.1(2). B.M. decided on her own that communicating with J.B. was not in the child's best interests. And given the mother's decision to cut off contact in 2018, it is not surprising that P.B. told the GAL in 2021 that she could not remember what her father looked like.

Second, the GAL's report was not balanced. She spent no time talking to the father or the paternal grandparents.[13] If she had, the report would have offered

---

[12] If a parent takes unilateral action to shut the other parent out of the child's life, that parent cannot show the noncustodial parent rejected the duties imposed by the parent-child relationship. *See In re K.P.*, No. 14-2068, 2015 WL 4644800, at *4 (Iowa Ct. App. Aug. 5, 2015); *see also In re H.N.M.*, No. 17-1802, 2018 WL 2731 643, at *1 (Iowa Ct. App. June 6, 2018) ("Although the father was not as aggressive in seeking visitation or attempting to communicate with his daughter as one might expect, responsibility for this situation does not fall entirely on the father's shoulders as the mother did her best to thwart any visits or communication between the father and his daughter.").

[13] True, the father agreed it was not the GAL's fault that he was not able to "set up a time to talk with her." But the record does not show that the GAL went out of her way to make that connection. Rather, the GAL cross-examined the father, "I realize my phone number was not included in the order appointing me, but did you ever even Google me?" He agreed he had not "googled" her. In addition, this trial

more insight into J.B.'s service-related disabilities and his commitment to "co-parenting" with P.B.'s mother and stepfather. J.B. testified that he understood it would take time for P.B. to adjust to having visitation with him. But, in his view, the child "would have the benefit of having not one but two fathers who would love her, care for her, and support her." P.B. would also benefit from renewing her relationship with her parental grandparents. As our supreme court has stated: "Families come in all shapes and sizes . . . ." *Q.G.*, 911 N.W.2d at 774.

I also question the district court's reliance on *In re J.S.*, where a therapist warned of "potential harm" from "reopening the door to the father." No. 22-0028, 2022 WL 2824778, at *4 (Iowa Ct. App. July 20, 2022). By contrast, this record includes no expert evidence that P.B. faced any harm from being reintroduced to J.B. Without such evidence, the district court's conclusion just repeats its abandonment finding: because J.B. did not maintain contact with P.B., it is not in her best interest to renew that contact. That logic eliminates a particularized best-interests analysis. We know that chapter 600A terminations involve "a two-step process." *Q.G.*, 911 N.W.2d at 770. After making the threshold showing of abandonment, "the petitioner *next* must show by clear and convincing evidence termination of parental rights is in the best interest of the child." *Id.*

---

exchange between the GAL and the paternal grandmother underscores the limited nature of the GAL's investigation:

> [GAL]: I don't have any more questions. Thank you, Your Honor.
> [D.B.]: By the way, who are you?
> [GAL]: I am so sorry. . . . I'm the Guardian Ad Litem appointed by the Court to look out for [P.B.]
> [D.B.]: Okay.
> [GAL]: Sorry.
> [D.B.]: That's okay.

(emphasis added). But the district court's reasoning essentially creates a one-step test, allowing proof under section 600A.8 to fulfill the obligations of section 600A.1. This melding of the provisions is troubling because "[a]s a general rule of statutory construction, we avoid an interpretation or application of a statute that renders other portions of the statute superfluous or meaningless." *Little v. Davis*, 974 N.W.2d 70, 75 (Iowa 2022).

Because of the imbalance of the GAL report[14] and the district court's reasoning, I cannot find that B.M. has met *her* burden to show there are "no serious or substantial doubt[s] about the correctness" of terminating J.B.'s legal relationship with P.B. *See In re M.S.*, 889 N.W.2d 675, 679 (Iowa Ct. App. 2016) (citing *In re L.G.*, 532 N.W.2d 478, 481 (Iowa Ct. App. 1995)). In determining best interests, "we look to the father's past performance, 'for that performance may be indicative of the quality of the future that parent is capable of providing.'" *In re B.H.A.*, 938 N.W.2d 227, 233 (Iowa 2020). Here, the father's past performance includes honorable sacrifices for his country, followed by years of struggle to overcome the damage suffered from that service. I would find that his mettle, resilience, and love would be valuable qualities to pass on to his daughter.

---

[14] The responsibilities of the GAL are not discussed with the same specificity in chapter 600A as they are in chapter 232. *Compare* Iowa Code § 600A.2(11), *with id.* § 232.2(22)(b). Still, at minimum, in any termination proceeding, a GAL should obtain "firsthand knowledge, if possible, of the facts, circumstances, and parties involved" whether by conducting interviews with *both* parents or otherwise. *Id.* § 232.2(22)(b)(1), (5). This is so because "[c]onceptually, the standards and rules applicable to terminations under one chapter should not differ from the provisions leading to the identical result in another chapter." *In re E.J.R.*, 400 N.W.2d 531, 532 (Iowa 1987).